IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| SANDRA KAY WILES, ) | CIVIL ACTION NO. 9:14-2766-TLW-BM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein she was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.).

Plaintiff applied for Disability Insurance Benefits (DIB) on September 13, 2010 (protective filing date), alleging disability beginning January 1, 2009 (amended onset date), due to numbness in her hands; deteriorating discs; memory loss; spasms of her muscular system; sensory organ malfunction; and temporary loss of her hearing, sight, and motor skills. (R.pp. 14, 38-39, 132, 136). Plaintiff's claims were denied both initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on November 13, 2012. (R.pp. 34-66). The ALJ thereafter denied Plaintiff's claims in a decision issued January 3, 2013. (R.pp. 14-



31). The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 1-4).

Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for further consideration, or for an outright award of benefits. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

## Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)).

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a *de novo* judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court



disagree with such decision as long as it is supported by 'substantial evidence.'" Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

## Discussion

A review of the record shows that Plaintiff, who was forty-eight years old on the date she alleges she became disabled and fifty-two years old at the time of the ALJ's decision, has a high school equivalent education (GED) and past relevant work experience as a quality control inspector and massage therapist. (R.pp. 29, 30, 137). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that she has an impairment or combination of impairments which prevent her from engaging in all substantial gainful activity for which she is qualified by her age, education, experience, and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12) months.

After a review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[1] of degenerative disc disease (DDD) of the spine, status post fracture of her right wrist, borderline intellectual functioning, and bipolar affective disorder (R.p. 16), she nevertheless retained the residual functional capacity (RFC) to perform light work[2] with limitations of no more than frequent pushing/pulling with her right upper extremity; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and

---

[1] An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987).

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).



crawling; never climbing ladders, ropes, or scaffolds; no overhead reaching with her bilateral extremities; frequent handling with her right upper extremity; and avoidance of even moderate exposure to hazzards. The ALJ also found that Plaintiff was limited, due to her mental impairments and borderline intellectual functioning, to performing unskilled work and/or routine, repetitive tasks that did not involve interaction with the public. (R.p. 24). Although the ALJ found that these limitations rendered Plaintiff unable to perform any of her past relevant work, she obtained testimony from a vocational expert (VE) and found at step five that Plaintiff could perform other jobs existing in significant numbers in the national economy, and was therefore not disabled during the time period at issue. (R.pp. 29-31).

Plaintiff asserts that in reaching this decision the ALJ erred by failing to properly analyze the treating and evaluating physician opinions as required by 20 C.F.R. § 404.1527(d)(1)-(6), SSR 96-2p, and SSR 96-5p; by failing to properly evaluate whether Plaintiff's DDD met the criteria of Listing 1.04[3]; by failing to explain her findings regarding Plaintiff's RFC as required by SSR 96-8p; and by failing to properly evaluate Plaintiff's credibility. After careful review and consideration of the arguments presented, for the reasons set forth hereinbelow the undersigned is constrained to agree with the Plaintiff that the ALJ committed reversible error in reaching her RFC determination, thereby requiring reversal of the decision with remand.

---

[3]In the Listings of Impairments, "[e]ach impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). A claimant is presumed to be disabled if his or her impairment meets or is medically equivalent to the criteria of an impairment set forth in the Listings. See 20 C.F.R. § 416.925.



**Medical Records**

An MRI of Plaintiff's cervical spine in July 2008 indicated multilevel DDD with varying degrees of spinal and neural foraminal stenosis, the most significant of which was a moderately severe spinal stenosis with encroachment upon the spinal cord at C5-6. (R.pp. 242, 250). A lumbar spine MRI revealed desiccated discs and mild to moderate osteoarthritis of the facet joints, producing no significant neural encroachment or stenosis proximal to L5. Mild encroachment upon the left L5 nerve due to mild foraminal stenosis secondary to moderately severe osteoarthritis of the facet joints was noted. (R.pp. 243, 245). An MRI of Plaintiff's thoracic spine showed multilevel DDD with osteophytes confined to the anterior pre-vertebral space, and no disc bulge or protrusion into the spinal canal. (R.p. 246).

The record further reflects that Plaintiff has been treated by Dr. Alberto Gonzalez, a psychiatrist, since approximately 1995 (see R.p. 398). The record contains treatment notes beginning in July 2004,[4] and indicate that Plaintiff was seen by Dr. Gonzalez in October 2008. (R.pp. 320-321). On January 6, 2009, Plaintiff reported to Dr. Gonzalez that she was feeling anxious and her sleep was erratic. (R.p. 320).

Dr. Marshall A. White performed a neurological examination on January 15, 2009, at which time Plaintiff reported some muscle spasms and a change in her physical capacities. Dr. White thought that the majority of Plaintiff's problems were in her cervical area with moderately severe spinal stenosis that was contacting her spinal cord at C5/6, and to a lesser degree at C6/7. Examination revealed motor power of 5/5 (full) throughout, 2+ and symmetric deep tendon reflexes, intact sensory examination, and a normal gait. Dr. White diagnosed Plaintiff with spinal stenosis;

---

[4]Dr. Gonzalez's notes are handwritten and at times are difficult to decipher.



opined that the stenosis was potentially significant and would require, in time, surgery; and referred Plaintiff to a neurosurgeon. (R.pp. 255-257).

Plaintiff was examined by Dr. John D. Steichen, of Charleston Neurological Associates, on February 24, 2009. She reported pain, discomfort, paresthesias of her bilateral upper extremities, and problems with clumsiness, opening jars, balance, and falls. Examination revealed full range of motion of Plaintiff's neck, full symmetric motor strength with normal bulk and tone, intact sensory, and brisk reflexes. Dr. Steichen's impression was that the 2008 MRI did not show significant cord compression, and the plan was for Plaintiff to follow up with Dr. White. (R.pp. 260-262).

Plaintiff had appointments with Dr. Gonzalez in March, September, and December 2009. (R.pp. 320-321).

On December 15, 2009, examination by Dr. Sunil Patel, a neurosurgeon at the Medical University of South Carolina, revealed slight weakness and a positive Romberg's sign.[5] Dr. Patel recommended physical therapy and opined that if Plaintiff's symptoms did not improve, she would need multilevel decompression and fusion surgery. He also noted that Plaintiff had a history of a fractured wrist with repair in 2008. (R.p. 287). On March 2, 2010, Dr. Patel stated he would not perform surgery if Plaintiff's symptoms stabilized. Plaintiff reported continuing problems with imbalance and weakness in her hands, while an examination revealed difficulty with tandem gait but the problem was stable. (R.p. 289).

---

[5]Romberg's sign is the "swaying of the body or falling when standing with the feet close together and the eyes closed; the result of loss of joint position sense, seen in tabes dorsalis and other diseases affecting the posterior columns." Dorland's Illustrated Medical Dictionary, 1715 (32nd ed. 2012).



Plaintiff was again seen by Dr. Gonzalez on September 13, 2010. (R.p. 319). On November 9, 2010, Plaintiff reported to Dr. Patel that her neck pain was a little better, but she had multiple other symptoms, including sharp dorsal pain with a crushing feeling. Dr. Patel recommended a cardiac evaluation, discharged Plaintiff from his care, and said that he would reevaluate Plaintiff's cervical stenosis and spondylosis if her symptoms worsened. (R.p. 290).

Plaintiff was admitted to Orangeburg Regional Medical Center on December 19, 2010, after having been outside for twelve to thirteen hours. She reportedly had a disagreement with a friend, became angry, ran out of the car and into the woods, and was not located until the next morning. Examination revealed symptoms of being paranoid, agitation, anger, lack of insight into her problems, impaired judgment and reasoning, confusion, disorientation as to the date, and rambling speech. Plaintiff was diagnosed with bipolar disorder with psychotic features, chronic pain syndrome, and severe psychosocial stress. It was noted that she had recently been taken off Adderall by her physician. Her GAF score was assessed as 35 on admission and 45 at the time of her discharge on December 24, 2010.[6] (R.pp. 298-301, 308-312). On January 24, 2011, Dr. Gonzalez wrote that Plaintiff had not been doing well and noted that she had been admitted to the hospital. (R.p. 319).

On February 24, 2011, Dr. Ester R. Hare examined Plaintiff for wrist pain, mainly in Plaintiff's right wrist. Plaintiff had normal range of motion of her neck, her gait and station appeared normal, she was able to perform fine and gross manipulation even with her right hand (the one on

---

[6]"Clinicians use a GAF [Global Assessment of Functioning] to rate the psychological, social, and occupational functioning of a patient." Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595, 597 n.1 (9th Cir. 1999). A GAF score of 31 to 40 indicates some impairment in reality testing or communication or "major impairments in several areas," while a score of 41 to 50 indicates "serious symptoms" or "serious difficulty in social or occupational functioning." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

7



which she had had surgery), she had good movement in her right wrist, mini-mental status was within normal limits, she was able to walk without any pain, straight leg raise testing was normal, and she had pressure point tenderness. Dr. Hare noted that Plaintiff saw a psychiatrist and might need a medication adjustment, and recommended that Plaintiff see an orthopedist or a rheumatologist for problems related to her DDD. (R.pp. 323-325).

On March 21, 2011, state agency physician Dr. Judith Volgelsang reviewed Plaintiff's records and opined that Plaintiff had the lifting capacity for light work; that she could walk, stand, and sit about six hours in an eight-hour day, with regular breaks for position changes; was limited in her upper extremities to no constant pushing or pulling with her right hand; could occasionally climb ramps and stairs, balance, stoop kneel, crouch, and crawl; should never climb ladders, ropes, and scaffolds; could not perform direct overhead work bilaterally; was limited to frequent handling on the right; and should avoid concentrated exposure to extreme cold and even moderate exposure to vibration and hazards. (R.pp. 327-333).

Plaintiff was evaluated by Dr. James H. Way, a psychologist, on March 25, 2011. Dr. Way noted that he had difficulty obtaining adequate details from Plaintiff secondary to her style of responding, as her speech was slow and loud at times and she had difficulty answering questions precisely. Plaintiff's reported activities of daily living included that she cleaned her home, walked her dog, cooked, completed laundry tasks, completed grocery shopping tasks, listened to music, interacted with a friend, had a driver's license, and continued to drive. She stated that she required assistance with directing funds management. Dr. Way administered testing that indicated Plaintiff was able to read at the sixth grade level, and do math computations at the third or fourth grade level. Her full scale IQ was a 74. Plaintiff's scores fell predominantly at the upper end of the borderline



range to the lower end of the low average range. Dr. Way diagnosed Plaintiff with borderline intellectual functioning and deferred diagnoses of post-traumatic stress disorder (PTSD) and psychotic disorder. He opined that Plaintiff possessed adequate intellectual skills to perform basic self-care tasks; perform basic activities of daily living; and to learn simple, repetitive, unskilled occupational tasks. Dr. Way thought that Plaintiff was able to understand the spoken word, follow the flow of conversation, and follow simple instructions; possessed adequate intellectual skills to make appropriate adjustments and decisions in an occupational setting; and experienced some paranoia in the recent past which might create difficulties making appropriate adjustments and decisions in an occupational setting. (R.pp. 334-338).

On April 12, 2011, state agency psychiatrist Dr. Stanley W. Golon opined that Plaintiff had mild restrictions in her activies of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace due to her memory impairment, borderline intellectual functioning, and bipolar disorder; and one or two repeated episodes of decompensation. (R.pp. 341-355). He further opined that Plaintiff had the mental RFC for "low stress, simple, repetitive work related activities [with] limited contact [with] others." (R.p. 351).

On May 9, 2011, Plaintiff requested that Dr. Gonzalez fill out disability papers she had brought with her. She reported numbness in her hands and falling, stated she had fallen three days prior to the appointment, but could not remember the last time (prior to that) she fell. (R.p. 362). Dr. Gonzalez completed a questionnaire titled "Medical statement concerning depression with anxiety OCD, PTSD, or panic disorder for Social Security disability claim," on which he checked boxes indicating that Plaintiff had signs and symptoms of anhedonia, psychomotor agitation or retardation,



decreased energy, difficulty concentrating or thinking, generalized persistent anxiety, apprehensive expectation, vigilance and scanning, recurrent obsessions or compulsions, and recurrent and intrusive recollections of a traumatic experience. He further opined that Plaintiff had marked restrictions in her activities of daily living and in maintaining social functioning; deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; repeated episodes of deterioration or decompensation in work-or work-like settings; and a complete inability to function independently outside the area of her home due to panic attacks. Dr. Gonzalez also checked boxes opining that Plaintiff was markedly impaired in her ability to remember locations and work-like procedures; to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule; to maintain regular attendance; to be punctual within customary tolerances; and to respond appropriately to changes in the work setting. He wrote that her diagnosis was adjustment disorder with mixed emotional features of depression and anxiety, that she had symptoms of major depression with psychotic features (disorganized), and was not able at that point to function consistently and reliably in any endeavor. (R.pp. 402-404).

On September 7, 2011, Dr. Monique Singleton performed a comprehensive orthopaedic examination. Dr. Singleton's assessed Plaintiff with DDD of the spine, osteoarthritis, status post fracture of her right wrist, and depression. Physical findings included pain with range of motion; mild difficulty squatting; full range of motion of Plaintiff's shoulders, elbows, and wrists; normal range of motion of her cervical and lumbar spine; 5/5 grip strength; normal fine and gross manipulation; normal tandem and heel-to-toe walking; no gait disturbance; no lower extremity



muscle weakness; no sensory loss; reflexes decreased on the right; no evidence of atrophy; and normal straight leg raising. (R.pp. 366-368).

On October 21, 2011, state agency physician Dr. Mary Lang reviewed Plaintiff's medical records and made similar findings to those of state agency physician Dr. Vogelsang (that Plaintiff could perform a range of light work). (R.pp. 370-373). On October 28, 2011, state agency psychologist Dr. Michael Neboschick opined that Plaintiff had mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and one to two repeated episodes of decompensation. He thought that Plaintiff was able to understand and remember simple instructions; maintain attention for simple, structured tasks for periods of two-hour segments; adapt to changes, although it would be best if they were infrequent and gradually introduced; make simple work-related decisions; maintain appropriate appearance and hygiene; recognize and appropriately respond to hazards; and that she would work best in well-structured, supervised, uncrowded settings that did not involve direct, ongoing interaction with the public. (R.pp. 377-392).

On September 20, 2012, Plaintiff reported to Dr. Gonzalez that she continued to be distracted and unable to remember things. He noted that Plaintiff seemed to be guarded and did not trust anyone, although she depended on one or two friends. (R.p. 401). Dr. Gonzalez completed another questionnaire in which he checked that Plaintiff had signs and symptoms of anhedonia, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or retardation, decreased energy, difficulty concentrating or thinking, thoughts of suicide, hallucinations, generalized persistent anxiety, motor tension, autonomic hyperactivity, apprehensive expectation, vigilance and scanning, persistent irrational fear, recurrent severe panic attacks, recurrent obsessions

11



or compulsions, and recurrent and intrusive recollections of a traumatic experience. He opined that Plaintiff had marked restrictions in her activities of daily living and in maintaining social function; deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; repeated episodes of deterioration or decompensation in work or work-like settings; and a complete inability to function independently outside of her home due to panic attacks. Dr. Gonzalez also checked boxes indicating that Plaintiff was markedly to extremely impaired as to all work limitations. He wrote that he had known Plaintiff for more than sixteen years, that she had traditionally had a strong work ethic, working several jobs at a time; but that in the last several years her mental status had decreased to the point that she was not able to function in any capacity in a consistent, reliable, and effective manner. Dr. Gonzalez wrote that Plaintiff had symptoms of depression, anxiety, and dementia which were not amenable to treatment, that her medications were presently helping her to sustain a marginal level of functioning which was constantly upheld by family and friends; that she was often taken advantage of by acquaintances; she often lost and forgot things and neglected herself through forgetting medications, food, and taking care of her personal hygiene; and that she lost track of periods of time. (R.pp. 396-399).

## Mental RFC

Plaintiff alleges that the ALJ failed to explain her findings regarding Plaintiff's RFC, as required by SSR 96-8p. In particular, she argues the ALJ failed to explain why someone with Plaintiff's mental impairments would not be restricted in terms of dealing with co-workers or in dealing with stress. Specifically, Plaintiff notes that although the ALJ stated that she gave great



weight to the opinions of the state agency psychiatrist and psychologist (R.p. 27),[7] she failed to address or include limitations to low-stress work and limited contact with others as opined to by Dr. Golon.

RFC is defined as "the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). In SSR 96-8p, RFC is defined as a function-by-function assessment of an individual's physical and mental capacities to do sustained, work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours per day, five days per week, or the equivalent. SSR 96-8p, 1996 WL 374184. An RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations);" Id. at *7; and "[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir.2015), citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013); see also, e.g., Neely v. Comm'r of Soc. Sec., No. 1:14–cv–01109–TLW, 2015 WL 3536690, at *12 (D.S.C. June 4, 2015); Washington v. Colvin, No. 1:14–cv–2415–BHH, 2015 WL 3868063, at *29 (D.S.C. June 23, 2015).

The Commissioner appears to argue that the ALJ's RFC assessment is supported by substantial evidence because Plaintiff failed to establish disabling mental limitations and the ALJ's findings are supported by the consultative examination of Dr. Way and the findings of the state agency experts Drs. Golon and Neboschick. In arguing that the jobs identified by the VE do not

---

[7]The ALJ refers to the opinions of the state agency psychologists (R.p. 27), but cites the records of psychologist Neboschick and psychiatrist Golon (who signed his evaluation with the title "MD" - see R.p. 340).

13



involve dealing with people or stress, the Commissioner contends that unskilled work generally involves working with things rather than people, the jobs identified are "not significant" as to dealing with people, and unskilled work is generally low stress. However, although the ALJ limited Plaintiff to work that does not involve interaction with the public, she did not include a restriction to limited contact with co-workers, and it is therefore unclear from the ALJ's decision and the hypothetical she gave to the VE whether the ALJ considered or included Dr. Golon's opinion that Plaintiff should in general have limited contact with "others", as opposed to just the public, in establishing Plaintiff's RFC. Even so, any error in this regard (which is what is argued by the Plaintiff) would be harmless based on the Dictionary of Occupational Titles (DOT)[8] descriptions of the jobs identified by the VE, which list interaction with "People" as being "Not Significant."[9] See, e.g., Larsen v. Astrue, No. 1:10–CV–00936–JLT, 2011 WL 3359676, at *15 (E.D.Cal. Aug.3, 2011)[jobs with "not significant" level of interaction in DOT appropriate for claimants with RFC specifying limited or occasional coworker contact]; Arsenault v. Astrue, Civil No. 08–269–P–H, 2009 WL 982225, at *3 (D.Me. Apr.12, 2009)[noting that other courts found that a description that "people "Taking-Instructions-Helping" was required but was "Not Significant indicated that interaction with the public and/or coworkers and supervisors was not significant or not more than occasional]; see also Mickles v. Shalala, 29 F.3d 918, 925-926 (4th Cir. 1994) [finding the ALJ's error harmless when the ALJ would

---

[8]The DOT is "a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy." Burns v. Barnhart, 312 F.3d 113, 119 (3d Cir. 2002). "[T]he DOT, in its job definition, represents approximate maximum requirements for each position rather than the range." See Fenton v. Apfel, 149 F.3d 907, 911 (8th Cir. 1998).

[9]See DICOT 209.667-014 (Order Caller, "People: 6-Speaking-Signaling N-Not Significant"); DICOT 209.687-026 (Mail Clerk, "People: 8-Taking Instructions-Helping N-Not Significant"); DICOT 239.567-010 (Office Helper, "People: 6-Speaking-Signaling N-Not Significant").

14



have reached the same result notwithstanding an error in his analysis]; Ngarurih v. Ashcroft, 371 F.3d 182, 190 n. 8 (4th Cir. 2004) ["reversal is not required when the alleged error clearly had no bearing on the . . . substance of the decision reached."].

However, even if the jobs identified by the VE do only require limited contact with co-workers, it is not clear that the jobs identified by the VE limited Plaintiff to the performance of only low stress jobs. The Commissioner contends that:

> [u]nskilled work is generally low stress and involves remembering only very short and simple instructions in a routine environment in which "concentration is not critical." *See* Program Operations Manual System (POMS) DI 25020.010(B)(3), *available at* http://policy.ssa.gov/poms.nsf/lnx/0425020010 (effective Sept. 14, 2012) (explaining that unskilled work involves "remember[ing] very short and simple instructions," and that "concentration is not critical"); SSR 85-15(1), 1985 WL 56857, at *4 (explaining that unskilled work requires "remember[ing] simple instructions" in a "routine work setting"); 20 C.F.R. § 404.1568(a) (defining unskilled work as work that needs little or no judgment and consists of simple duties that can be learned on the job in a short period of time); *Menkes v. Astrue*, 262 F. App'x 410, 412 (3d Cir. 2008) ("[P]erforming a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration.").

Commissioner's Brief, ECF No. 18 at 22, n. 6. However, low stress jobs have also been defined as jobs not requiring fast-paced production or rigid quotas. See, e.g., Winston v. Colvin, No. 4:13–CV–221–FL, 2015 WL 450835, at *3 (E.D.N.C. Feb. 3, 2015)[noting that the ALJ found that the claimant required a low stress work setting which was further defined as a work setting that was non-production pace or quota based, with no more than occasional changes in the work setting, and no more than occasional decision-making]; Nelson v. Colvin, No. 4:11–03367–TER, 2013 WL 4647531, (D.S.C. Aug. 29, 2013)[ALJ's RFC finding included a restriction to a low stress environment, which was defined as no fast-paced production or rigid quotas]. It is not clear what category the ALJ considered the jobs identified fit into, or whether she even believed a further

15



restriction to non-production or quota based jobs was required, as that issue was not specifically discussed.  (R.p. 61); see Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001)[Court cannot affirm a decision on a ground that the ALJ did not himself invoke in making the decision]; Bray v. Commissioner of Social Security Admin., 554 F.3d 1219, 1225 (9th Cir. 2009)["Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ - not *post hoc* rationalizations that attempt to intuit what the adjudicator may have thinking."].

While the undersigned might have previously been reluctant to recommend a reversal with remand based solely on this argument, since the definition of what constitutes "low stress" varies; see Kellough v. Heckler, 785 F.2d 1147, 1149 (4th Cir. 1986) ["If the Secretary's dispositive factual findings are supported by substantial evidence, they must be affirmed, even in cases where contrary findings of an ALJ might also be so supported."] (citation omitted)]; in light of the Fourth Circuit's recent decision in Mascio, the ALJ also did not appropriately consider or explain her RFC assessment in conjunction with her finding that Plaintiff has moderate deficiencies in concentration, persistence, and pace.  See Hays, 907 F.2d at 1456 [Noting that the court's scope of review includes whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law].  The ALJ apparently concluded that restricting Plaintiff to unskilled work and/or routine, repetitive tasks accounted for this limitation, a conclusion which finds support in previous caselaw. Cf. Wood v. Barnhart, No. 05-432, 2006 WL 2583097 at * 11 (D.Del. Sept. 7, 2006) [By restricting plaintiff to jobs with simple instructions, the ALJ adequately accounted for plaintiff's moderate limitation in maintaining concentration, persistence or pace]; McDonald v. Astrue, 293 Fed. App'x 941, 946-47 (3d Cir. 2008) [noting that the ALJ properly accounted for his finding that the claimant

16



had moderate limitations in concentration by limiting him to simple, routine tasks]; see also Hyser v. Astrue, No. 11-102, 2012 WL 951468 at * 6 (N.D.Ind. Mar. 20, 2012)[Finding limitation to jobs "involving only occasional contact with public and co-workers" accounted for moderate social functioning]. However, such a finding is no longer sufficient, by itself, after Mascio. See Mascio v. Colvin, 780 F.3d at 638 ["[A]n ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'"] (quoting Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir.2011)). While it may be that the ALJ will find, based on the evidence, that Plaintiff's moderate impairment in being able to concentrate and stay on task will not affect her ability to perform the unskilled work identified in the decision, she did not make that determination or finding here. See Mascio, 780 F.3d at 638 [noting that the ALJ may be able to explain why a concentration, persistence, or pace limitation did not translate into a limitation in the RFC ("[f]or example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the [VE]"), but finding that remand was appropriate because the ALJ gave no explanation].[10]

       Therefore, this case should be reversed and remanded for consideration of Plaintiff's RFC in light of all of the evidence and updated caselaw. With respect to the remainder of Plaintiff's claims of error, the ALJ will be able to reconsider and re-evaluate the evidence in toto as part of the reconsideration of this claim. Hancock v. Barnhart, 206 F.Supp.2d 757, 763-764 (W.D.Va. 2002)[On

---

[10] The ALJ of course did not have the benefit of the Fourth Circuit's 2015 decision in Mascio to guide her at the time she reached the decision in this case.



remand, the ALJ's prior decision has no preclusive effect, as it is vacated and the new hearing is conducted *de novo*].

## Conclusion

Based on the foregoing, and pursuant to the power of this Court to enter a judgment affirming, modifying or reversing the decision of the Commissioner with remand in Social Security actions under Sentence Four of 42 U.S.C. § 405(g), it is recommended that the decision of the Commissioner be **reversed**, and that this case be **remanded** to the Commissioner for reevaluation of the evidence as set forth hereinabove, and for such further administrative action as may be necessary. See Shalala v. Schaefer, 509 U.S. 292 (1993).

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

August 31, 2015
Charleston, South Carolina

18



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> Post Office Box 835
> Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

